UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

GURU TEG HOLDING, INC.,

          Plaintiff,

-against-

MAHARAJA FARMERS MARKET, INC.,
STATEWIDE MANAGEMENT HOLDING,
INC., SAJID SOHAIL, MANPREET SINGH,
JOHN DOES 1-5,

          Defendants.
----------------------------------------------------------X

**MEMORANDUM AND ORDER**

22-CV-1375 (GRB)(LGD)

FILED
CLERK
8/2/2022 4:54 pm
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**GARY R. BROWN, United States District Judge**:

    Plaintiff operates a local chain of Indian grocery stores known as "Maharaja Farmers Market." Plaintiff brought this action against defendants seeking injunctive relief and damages under the Lanham Act and New York law for trademark infringement. Plaintiff now seeks a preliminary injunction to enjoin defendants' infringement of plaintiff's federal and state registered trademarks. For the reasons set forth below, following a hearing, the preliminary injunction is GRANTED.

    *Facts*

    From 1992 to 2015, Cherian Arikupurathu, a/k/a Joseph Cherian owned and operated the retail grocery store Maharaja Farmers Market in Hicksville, New York. Docket Entry ("DE") 24-1, Aff. of Cherian Arikupurathu, ¶4. In 2015, plaintiff's predecessor in interest, A&S Vegetables, Inc., purchased Cherian's grocery store in Hicksville together with the exclusive rights to the Maharaja trademark. DE 24-2, Aff. of Senthil Lakshmanan, ¶3; DE 24-1, ¶¶4, 6. Cherian, as licensee, continues to operate another Maharaja grocery store in Glen Oaks, New York. DE 24-2, ¶¶3, 8. Together, plaintiff and Cherian operate Maharaja grocery stores in Hicksville, New Hyde Park, Queens, and Bellerose. DE 24-2, ¶9.

    Principally at issue are two marks registered with plaintiff: (1) the A MAHARAJA STAYING AHEAD IN TASTE mark, Reg. No. 5,225,936 (the "Crown Mark") and (2) the MAHARAJA mark, Reg.

1

No. 6,362,773 (the "Maharaja Mark"), collectively "the Marks." In June 2017, the Crown Mark – illustrated below – was registered by A&S Vegetables, Inc. DE 1 at 31.



On January 20, 2022, A&S Vegetables, Inc. recorded its assignment of the Crown Mark to Guru Teg Holding, Inc. with the US Patent and Trademark Office (USPTO), effective *nunc pro tunc* July 15, 2015. DE 1 at 35; DE 24-2, ¶5.

In May 2021, the Maharaja Mark was registered by Cherian, consisting of the word "maharaja" applied to a retail grocery store. DE 1 at 30. On January 20, 2022, Cherian recorded his assignment of the Maharaja Mark to Guru Teg Holding, Inc. with the USPTO, effective *nunc pro tunc* July 15, 2015. DE 1 at 34. *See also* DE 24-1 at 6, Trademark Assignment.[1]

When Guru Teg Holdings, Inc.'s secretary, Senthil Lakshmanan, learned that defendant Sajid Sohail planned to reopen his defunct grocery store under the Maharaja name, he met with met with Sohail, once alone and once with Cherian. DE 24-2, ¶¶21, 24. According to Lakshmanan, Sohail "taunted" him that he was going to use the Marks because he believed plaintiff did not have any rights to the Maharaja name. DE 24-2, ¶25. Sohail – who did not appear at the hearing – claims Cherian told him he was free to

---

[1] In addition, plaintiff has one federal use-based trademark application and two state law trademark registrations. Plaintiff filed a use-based application, Serial No. 97231187, with the USPTO for the MAHARAJA FARMERS MARKET mark on January 21, 2022. *See* Trademark Electronic Search System (TESS), https://tmsearch.uspto.gov/bin/showfield?f=doc&state=4810:h7q803.4.1, last visited July 31, 2022.
On February 22, 2022, the MAHARAJA FARMERS MARKET mark, Reg. No. S25459, and the accompanying crown design, Reg. No. S25458, (the "State Marks") were registered by plaintiff with the New York Department of State. DE 1 at 37, 40. Defendants argue that the State Marks are defective because they were registered after defendants opened their store. DE 24-4 at 10. Because the federal trademarks claims are dispositive of the instant motion, the Court need not address this state law question.

use the mark.  DE 24-5, Aff. of Sajid Sohail, ¶15.  Cherian denies ever giving Sohail the right to use the Marks.  DE 24-1, ¶10.

In late 2021 and 2022, defendants filed applications for a number of trademarks bearing the name Maharaja, collectively "the Defendants' Marks."  In November 2021, Statewide Management, LLC filed an intent-to-use trademark application, Serial No. 97104701, for MAHARAJA FARMERS MARKET with the USPTO.[2]  On January 12, 2022, Statewide Management Group, LLC[3] filed an intent-to-use trademark application, Serial No. 97214853, for MAHARAJA FARMERS MARKET with a crown design which also features a nine-point crown, as illustrated below:[4]



On January 17, 2022, Sohail filed an intent-to-use application, Serial No. 97223191, for MAHARAJA BAZAAR.[5]  On January 31, 2022, Statewide Management Group, LLC filed an intent-to-use trademark application, Serial No. 97246801, for an effectively identical crown design,[6] and Sohail filed a use-based application, Serial No. 97246785, for MAHARAJA FARMERS MARKET.[7]

On January 11, 2022, Cherian's counsel wrote Sohail a letter warning that his use of the Marks would constitute trademark infringement.  DE 24-2 at 18.  On or about January 14, 2022, Sohail reopened

---

[2] *See* Trademark Electronic Search System (TESS), https://tmsearch.uspto.gov/bin/showfield?f=doc&state=4810:h7q803.6.1, last visited July 31, 2022.
[3] In an apparent typographical error, the applicant in defendants' trademark applications is at times named Statewide Management Group, LLC, and other times Statewide Management, LLC. As defendants have not suggested that they have been improperly named in this suit, the Court will assume defendants are the correct parties to this action.
[4] *See* Trademark Electronic Search System (TESS), https://tmsearch.uspto.gov/bin/showfield?f=doc&state=4810:h7q803.7.1, last visited July 31, 2022.
[5] *See* Trademark Electronic Search System (TESS), https://tmsearch.uspto.gov/bin/showfield?f=doc&state=4810:h7q803.11.1, last visited July 31, 2022.
[6] *See* Trademark Electronic Search System (TESS), https://tmsearch.uspto.gov/bin/showfield?f=doc&state=4810:h7q803.9.1, last visited July 31, 2022.
[7] *See* Trademark Electronic Search System (TESS), https://tmsearch.uspto.gov/bin/showfield?f=doc&state=4810:h7q803.10.1, last visited July 31, 2022.

his grocery store as Maharaja Farmers Market. DE 24-2, ¶28. Sohail's new store in Garden City Park is less than one mile from plaintiff's location in New Hyde Park, and less than two miles from the Bellerose location. DE 24-2, ¶22. On January 27, plaintiff's counsel sent Sohail's attorney a cease-and-desist letter detailing plaintiff's use of the Marks, including copies of the assignment and federal trademark registrations. DE 24-2 at 21-32.

There is evidence of continuing instances of actual confusion among customers. DE 24-2, ¶36. The manager at plaintiff's store, Jeffrey Jeyaraj, for example, testified that customers have been confused by the new Maharaja grocery store and many have complained about quality and customer service. DE 24-3, Tr. at 12:13-20. As he explained, "We have to distance ourselves and correct ourselves and say that this particular store that has opened is not ours." Tr. at 10:24-11:1. "[S]ome of the vendors would bring in the invoices to us and I say, hey brother, this is not for us. This doesn't belong to us." Tr. at 11:2-4.

According to Sohail, the word maharaja – which means prince – is a common term in Indian culture and has been used by many businesses for decades. DE 24-5, ¶¶2-3. Sohail avers that he did not act in bad faith because he adopted the name Maharaja Farmers Market "thinking that such phrasing could be used by anyone." DE 24-5, ¶10. Nonetheless, he admits they "were aware of others using the common dictionary term maharaja" but "did not think much of this." DE 24-5, ¶12. Sohail is not aware of any instances of consumers being confused between plaintiff's store and his, DE 24-5, ¶5, and denies that his store's products are inferior as his products are sourced from the same vendors as plaintiff's. DE 24-5, ¶16. However, consumers have left negative online reviews for defendants' Maharaja grocery store, with one asserting "[m]anagement doesn't have enough ethics to not sell expired meat to you." DE 24-2 at 16. Sohail claims that a preliminary injunction would harm him because he would "likely close [the] business for an uncertain amount of time" and "would need to pay for new signage, new advertising in print and digital media, new trademark and legal work[.]" DE 24-5, ¶¶18-19.

*Procedural History*

Prior to the filing of the complaint, Cherian attempted to amicably resolve the instant dispute between plaintiff and Sohail. Negotiations continued in February and March, but ultimately failed. DE 24-

1, ¶¶13-14. On March 12, 2022, plaintiff filed suit, seeking an order enjoining defendants from further infringing the Marks, bringing claims under 15 U.S.C. § 1114 (Infringement Of A Registered Trademark), 15 U.S.C. § 1125(a) (False Designation Of Origin And Unfair Competition), 15 U.S.C. § 1120 (False & Fraudulent Registration), 15 U.S.C. § 1125(d) (Violation Of The Anti-Cybersquatting Consumer Protection Act), N.Y.G.B.L. § 360-K (Trademark Infringement), N.Y.G.B.L. § 360-L (Injury To Business Reputation), and common law unfair competition and unfair trade practices. DE 1. After an entry of default was made against defendants on April 12, DE 14, defendants were granted an extension of time to file an answer to the complaint. Electronic Order dated 04/14/2022. After defendants answered the complaint on April 20, the following week plaintiff requested a pre-motion conference for a preliminary injunction. DE 19. The case was reassigned to the undersigned, who held a hearing on May 16, 2022. Electronic Order dated 05/16/2022. After further settlement negotiations proved unfruitful, DE 21, the Court ordered a briefing schedule for the preliminary injunction and the parties filed the fully-briefed motion papers on July 8, 2022. Electronic Order dated 06/07/2022; DE 24.

This opinion now follows.

*Legal Standards*

A party seeking preliminary injunctive relief must demonstrate "(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction." *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011) (citation omitted). To establish a Lanham Act infringement claim, plaintiff must establish (1) that "the plaintiff's mark is entitled to protection," and (2) that "defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003). "In trademark cases, a showing of likelihood of confusion as to source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm. To meet this burden, [the plaintiff] need[s] only to raise a serious

5

question of likelihood of confusion." *Am. Cyanamid Co. v. Campagna Per Le Farmacie in Italia, S.P.A.*, 847 F.2d 53, 55 (2d Cir. 1988) (internal quotation marks and citations omitted).

To evaluate whether there is a likelihood of confusion, the Court applies the eight-factor *Polaroid* balancing test. *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). "The eight factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) (citing *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 384 (2d Cir. 2005)). "The application of the *Polaroid* test is 'not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused.'" *Id.* Under the Trademark Modernization Act of 2020, "a plaintiff seeking a preliminary injunction is entitled to a rebuttable presumption of irreparable harm upon a court's finding a likelihood of success on the merits." *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 300 (S.D.N.Y. 2021); 15 U.S.C. § 1116(a). "Thus, if (1) the plaintiff establishes that it has a likelihood of success on the merits (that is, it establishes both the validity of its mark and a likelihood of confusion), and (2) the defendant fails to rebut the presumption, the plaintiff satisfies its burden of showing irreparable harm." *Two Hands IP LLC*, 563 F. Supp. 3d at 300.

The presumption of irreparable harm does not apply if "the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief." *Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 968 (2d Cir. 1995). "Though such delay may not warrant the denial of ultimate relief, it may, 'standing alone . . . preclude the granting of preliminary injunctive relief,' because the 'failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury[.]'" *Id.* (citations omitted). "Although delay may not negate the presumption of irreparable harm if the delay was caused by the plaintiff's ignorance of the defendant's competing

6

product or the plaintiff's making good faith efforts to investigate the alleged infringement, if it is not so explainable, 'delay alone may justify denial of a preliminary injunction[.]'" *Id.* (citations omitted). *See also Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).

*Discussion*

1. *Delay*

Defendants argue that a preliminary injunction should be denied because plaintiff has acted with "no sense of urgency at all." DE 24-4 at 4. As explained below, the record shows plaintiff has diligently pursued its legal right to enforce the Marks. After Sohail informed plaintiff that he intends to use the Marks, on January 11, 2022 Cherian's attorney wrote Sohail a letter warning that his use of the Marks would constitute trademark infringement. DE 24-2 at 18. A little over a week later on January 20, A&S Vegetables, Inc. recorded its assignment of the Crown Mark to plaintiff, DE 1 at 35, and Cherian recorded his assignment of the Maharaja Mark to plaintiff. DE 1 at 34. On January 27, less than two weeks after defendants opened the grocery store, plaintiff's counsel sent defendants a cease-and-desist letter. DE 24-2 at 21. On February 22, 2022, plaintiff registered two marks with New York state. DE 1 at 37, 40. Throughout this time in February and March, Cherian attempted, unsuccessfully, to mediate an amicable resolution between the parties. DE 24-1, ¶¶13-14. Finally, on March 12, 2022 plaintiff filed suit. DE 1. Afterward, defendants failed to appear and an entry of default was entered on April 12. DE 14. After being granted an extension of time to answer the complaint, defendants answered the complaint on April 20, and plaintiff requested a pre-motion conference for a preliminary injunction exactly one week later. DE 19.

Plaintiff's diligent efforts to protect the Marks are readily distinguishable from *Tough Traveler, Ltd.*, 60 F.3d at 968, where the plaintiff waited four months after commencing suit before seeking a preliminary injunction, or *Citibank, N.A.*, 756 F.2d at 276, where plaintiff did not seek a preliminary injunction until nine months after it received notice of defendant's intentions to open a competing store. In the two months from the time that defendants' store opened to the commencement of the suit, plaintiff diligently pursued its legal rights by either recording the assignment of the Marks, registering trademarks with New York state, or negotiating with defendants. After filing suit, plaintiff timely requested an entry

7

of default when defendants failed to appear, and, once defendants finally answered the complaint, plaintiff speedily sought leave to move for a preliminary injunction in only one week. Because plaintiff has diligently and swiftly sought to defend its legal rights from the time of the opening of defendant's store, there is no delay negating the presumption of irreparable harm.

    2. *Validity of the Marks*

Defendants question the validity of the Marks, arguing that they are generic and the assignment to plaintiff was suspect. DE 24-4 at 5-7. "There is a 'presumption of validity' that attaches to the issuance of a trademark registration. This rebuttable presumption merely shifts the burden of persuasion to the party seeking cancellation, or the alleged infringer." *Quality Serv. Grp. v. LJMJR Corp.*, 831 F. Supp. 2d 705, 712 (S.D.N.Y. 2011) (citing *Cold War Museum, Inc. v. Cold War Air Museum*, 586 F.3d 1352, 1357 (Fed. Cir. 2009)). As explained below, defendants' arguments do not overcome the Marks' presumption of validity.

    i. *The Marks Are Not Generic*

Defendants argue the Marks are invalid because the word maharaja is a "very common term" in Indian culture, which suggests the Marks are generic. "Generic marks are never entitled to trademark protection." *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir. 1997). If a mark is registered with the USPTO, it is presumed to not be generic and defendant bears the burden of overcoming that presumption. *Reese Pub. Co. v. Hampton Int'l Commc's, Inc.*, 620 F.2d 7, 11 (2d Cir. 1980). To determine if a mark is generic, courts apply the "primary significance test." Under that test, the court asks "whether the consuming public understands and commonly uses the term to denote a particular source or origin of a product, even if that source is unknown (in which case the mark is descriptive), as opposed to the nature or class of the product (in which case the mark is generic)." *See Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 360 (E.D.N.Y. 2007) (citing *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 113 (1938)); *see also* 15 U.S.C. § 1064(3) (codifying the primary significance test). Under the doctrine of foreign equivalents, a word that is commonly used in another language as a generic name cannot be a valid trademark. *Otokoyama Co. v. Wine of Japan Imp., Inc.*, 175 F.3d 266, 271 (2d Cir.

8

1999). "The test is whether, to those American buyers familiar with the foreign language, the word would be a generic name." § 12:41. Doctrine of foreign equivalents, 2 McCarthy on Trademarks and Unfair Competition § 12:41 (5th ed.); *see also Shandong Shinho Food Indus. Co. v. May Flower Int'l, Inc.*, 521 F. Supp. 3d 222, 250 n.12 (E.D.N.Y. 2021).

  Defendants argue maharaja is a common term in Indian culture, meaning prince. DE 24-4 at 6. Simply put, here the word "prince" is not an indication of the nature or class of an article; thus, the term cannot be considered generic. *Compare Otokoyama Co. v. Wine of Japan Imp., Inc.*, 7 Fed. App'x 112, 114 (2d Cir. 2001) (affirming cancellation of "plaintiff's trademarks on the grounds that 'otokoyama' is a generic term which, in Japanese, signifies a type of sake"); *Enrique Bernat F., S.A. v. Guadalajara, Inc.*, 210 F.3d 439, 445 (5th Cir. 2000) ("chupa," which is slang for lollipop in Spanish, is a generic term); *Blue & White Food Prod. Corp. v. Shamir Food Indus., Ltd.*, 350 F. Supp. 2d 514, 520 (S.D.N.Y. 2004) (the Hebrew phrase "Shamir Salads," which refers to a range of vegetable salads, dips, spreads, and herring products, "appears to be suggestive and thus entitled to trademark protection"). Defendant Sohail has offered no evidence, other than his own affidavit, that the average American consumer who is familiar with the South Asian cultures which use the word "maharaja" would consider the term generic. Perhaps the closest cultural analogy to maharaja in the anglosphere would be "king," a term frequently seen in the names of businesses yet may still supply a distinctive mark, such as Burger King®. As evidence of the term's ubiquity, defense counsel provides a list of ten trademark registrations containing the word maharaja across an array of industries. DE 24-4 at 6-7. However, the diverse list of marks containing maharaja is only evidence that the term is not generic, but rather may be used as a distinctive mark across many industries. For these reasons, the Marks are not invalid for genericness.

  And while defendants argue that the genericism argument goes to the validity of both marks, it plainly does not. Assuming, *arguendo*, that maharaja were deemed to be a generic term, that contention has no bearing on the visual elements of the Crown Mark. The Crown Mark embodies visual design elements, including distinctive fonts and shapes, that clearly render it distinctive.

  ii. *The Trademark Assignments Were Valid*

Without citing any law, defendants argue the assignment was invalid because it is "highly unusual" that the assignment was granted seven years *nunc pro tunc* and "it is unclear whether the mark in the registration was previously abandoned." DE 24-4 at 5. For these reasons, defendants assert that discovery is needed "to explore the history of the mark." *Id.*

Under 15 U.S.C. § 1114(1), a civil action to enforce a trademark may be brought by the "registrant," which embraces "legal representatives, predecessors, successors and assigns." 15 U.S.C. § 1127. "At least two requisites are inherent in the concept of assignment under the Act: (1) the need for the relevant assigning document to be effected 'by instrument[ ] in writing duly executed,' 15 U.S.C. § 1060(a)(3); and (2) the need for the assignment to transfer an ownership interest in the marks at issue." *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 73 (2d Cir. 2013). A *nunc pro tunc* assignment of a trademark may confer standing if the assignment occurred before the lawsuit was filed. *Cf. Shandong Shinho Food Indus. Co.*, 521 F. Supp. 3d at 242-43 ("a *nunc pro tunc* assignment after commencement of a suit cannot retroactively confer standing"). The assignment agreement, which was signed January 19 and made effective July 15, 2015 *nunc pro tunc*, assigns plaintiff all of Cherian's "worldwide right, title and interest in and to the mark . . . together with any and all common law rights . . the good will of the business symbolized by the Mark and the right to sue, and recover any damages and profits, for past or future infringements of the Mark." DE 24-1 at 6. The written agreement was then recorded with the USPTO on January 20, 2022. DE 1 at 34. Because the assignment is in writing and transfers plaintiff all of Cherian's ownership interest in the Maharaja Mark, the assignment was valid. Moreover, plaintiff has standing because the January 20 assignment occurred before commencing suit on March 12.[8]

"An abandoned trademark is not capable of assignment," and an "[i]mproper assignment or licensing of a mark may cause the mark to become abandoned." § 18:2. Anti-assignment-in-gross rule; § 17:6, Abandonment of a mark by improper assignment or licensing, 3 McCarthy on Trademarks and Unfair

---

[8] Plaintiff has not submitted a written agreement evidencing A&S Vegetables, Inc.'s assignment of the Crown Mark to Guru Teg Holding, Inc., but the recording of the assignment with the USPTO, DE 1 at 35, creates the presumption that said assignment was valid as well.

10

Competition (5th ed.). "Abandonment is an affirmative defense" and the party asserting an abandonment defense bears the burden of persuasion. *Pado, Inc. v. SG Trademark Holding Co. LLC*, 527 F. Supp. 3d 332, 341 (E.D.N.Y. 2021). "To establish the defense of abandonment, it is necessary to show either the owner's intent to abandon the mark, or a course of conduct on the part of the owner causing the mark to become generic or lose its significance as a mark." *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 110 (2d Cir. 2000); *see* 15 U.S.C.A. § 1127 (defining "abandonment"). Here, defendants have presented no evidence, and there is none in the record, suggesting the Marks were abandoned prior to their assignment. To the contrary, Cherian opened the initial Hicksville location thirty years ago in 1992 and plaintiff has continuously owned and operated multiple Maharaja grocery store locations since 2015. The sale of the Hicksville location and trademark in 2015, coupled with Cherian's continued operation of other Maharaja locations, does not suggest an improper assignment, abandonment, or genericization of the Marks; rather, it evidences a simultaneous assignment and license-back arrangement in which plaintiff became the assign and Cherian the licensee of the trademark. *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992) ("a simultaneous assignment and license-back of a mark is valid, where, as in this case, it does not disrupt continuity of the products or services associated with a given mark"); *see also Visa, U.S.A., Inc. v. Birmingham Tr. Nat. Bank*, 696 F.2d 1371, 1377 (Fed. Cir. 1982) (characterizing assignment and license-back agreements as a "well-settled commercial practice").

Because the Marks are not generic and the trademark assignments were valid, defendants have failed to overcome the Marks' presumption of validity. As such, plaintiff has established a likelihood of success that the Marks are entitled to protection.

*3. Likelihood of Confusion*

Next, the Court assesses the eight *Polaroid* factors to determine whether defendants' alleged infringement of the Marks presents a likelihood of confusion.

  i. *Strength of the mark*

"[T]he strength of a mark depends ultimately on its distinctiveness, or its origin-indicating quality, in the eyes of the purchasing public." *Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 515 F. Supp. 3d 47, 71

11

(S.D.N.Y. 2021) (quoting *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 457 (2d Cir. 2004)). The four categories of inherent distinctiveness, in ascending order, are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Id.* (citing *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 131 (2d Cir. 2004)). "Arbitrary or fanciful marks are ones that do not communicate any information about the product either directly or by suggestion." *Star Indus., Inc.*, 412 F.3d at 385. "Suggestive marks and arbitrary or fanciful marks are each inherently distinctive," *id.*, for which "the law accords broad, muscular protection." *Virgin Enters. Ltd.*, 335 F.3d at 147. Finally, "[r]egistration by the PTO without proof of secondary meaning creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive." *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999).

Because the word "maharaja" does not connote any association with grocery stores, the Marks are arbitrary and thus inherently distinctive, as evidenced by their registration with the USPTO. Hence, the first factor weighs in favor of plaintiff.

    *ii.    Similarity of the marks*

When evaluating the similarity of the marks, "courts must analyze the mark's overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005) (quotation marks and citation omitted). "When the secondary user's mark is not identical but merely similar to the plaintiff's mark, it is important to assess the degree of similarity between them in assessing the likelihood that consumers will be confused." *Virgin Enters. Ltd.*, 335 F.3d at 149.

As the undesigned observed at the May 16, 2022 hearing, the "graphic elements [of the marks] are virtually identical." Tr. at 4:2-4. A comparison of these two images, as seen below, speaks volumes:

Detail from Plaintiff's Sign          Detail from Defendant's Sign

     

DE 1 at 12-13.  Defendants' signage – similar to Defendants' Marks – utilize a nearly identical nine-point crown, an identical background banner, and a virtually indistinguishable font from plaintiff's sign, which is taken from the Crown Mark.  Given the nearly identical appearance of the marks and defendants' use of the word "maharaja," the similarity factor weighs overwhelmingly in favor of plaintiff.  *See Virgin Enters. Ltd.*, 335 F.3d at 149 (where defendants used the same name as plaintiff, the defendants' mark was sufficiently similar to increase the likelihood of confusion despite other differences).  Defendants argue that their mark for MAHARAJA FARMERS MARKET, Serial No. 97104701, differs from plaintiff's Maharaja Mark, Reg. No. 6,362,773, because plaintiff's does not contain the words "farmers market."  The word at issue is "maharaja," not the generic term "farmers market."  For these reasons, the similarity factor weighs in plaintiff's favor as well.

*iii.-iv. Proximity of the products and likelihood of bridging the gap*

"The 'proximity-of-the-products' inquiry concerns whether and to what extent the two products compete with each other," *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996), whereas "'[b]ridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus., Inc.*, 412 F.3d at 387. "When . . . the parties' goods are the same, this *Polaroid* factor is irrelevant because there is no gap to bridge." *3M Co. v. Performance Supply, LL*C, 458 F. Supp. 3d 181, 195 (S.D.N.Y. 2020).  Because both plaintiff and defendants operate Indian retail grocery stores, the proximity factor weighs heavily in plaintiff's favor.

*v.     Actual confusion*

13

"It is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion." *Virgin Enters. Ltd.*, 335 F.3d at 151. As such, "evidence of actual confusion [is] 'particularly relevant' to the inquiry." *Id.* (citation omitted). Plaintiff's store manager testified at the hearing that customers have expressed confusion over the new Maharaja location opened by defendants, and some vendors have mistakenly brought invoices to their store instead of defendants'. Tr. at 10:24-11:4. According to Lakshmanan, his store managers and employees continue to report instances of confusion by customers who mistakenly believed defendants' store is associated with theirs. DE 24-2, ¶36. Sohail asserts that "[w]e have not had any instances of consumers being confused between Plaintiff and my business," DE 24-5, ¶5, but, unlike plaintiff, did not offer any testimony from store employees regarding consumer confusion at the hearing. Because there is considerable evidence of actual consumer confusion, this factor weighs heavily in plaintiff's favor.

    *vi.*    *Bad faith*

"This factor looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir. 1991) (quotation marks omitted). "Bad faith can be found where prior knowledge of the senior user's mark or trade dress is accompanied by similarities so strong that it seems plain that deliberate copying has occurred." *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 536 (S.D.N.Y. 2011), *aff'd*, 511 Fed. App'x 81 (2d Cir. 2013).

After Cherian and Lakshmanan met with Sohail regarding his plans to use the Marks, Cherian's counsel wrote Sohail a letter warning that his use of the Marks would constitute trademark infringement. DE 24-2 at 18. Sohail claims Cherian gave him oral permission to use the Marks, but Cherian denies ever giving authorization. Compare DE 24-5, ¶15 and DE 24-1, ¶10. Although Sohail asserts that he believed the name Maharaja Farmers Market "could be used by anyone," DE 24-5, ¶ 10, he admits they "were aware of others using the common dictionary term maharaja." DE 24-5, ¶12. In spite of this, defendants opened their Maharaja-branded grocery store less than one mile from plaintiff's location in New Hyde Park and refused to change the signage after receiving a cease-and-desist letter. Given plaintiff and licensee's thirty

14

years in the grocery business and the notable similarity between the marks, it appears defendants adopted the name Maharaja in order to capitalize on plaintiff's goodwill. Thus, the bad faith factor weighs heavily in favor of plaintiff as well.

      *vii.    Quality of the products*

"This factor is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir. 1995). According to plaintiff's manager, customers have complained about the quality and customer service at defendants' store. Tr. at 12:13-20. Consumers have left negative online reviews for defendants' grocery store, complaining that they were sold expired meat. DE 24-2 at 16. Defendants deny that their products are inferior as the products are sourced from the same vendors as plaintiff's. DE 24-5, ¶16. Although the record on the quality of defendants' products is less clear, overall this factor weighs in plaintiff's favor as well.

      *viii. Sophistication of consumers*

"The degree of sophistication of consumers can have an important bearing on likelihood of confusion. Where the purchasers of a products are highly trained professionals, they know the market and are less likely than untrained consumers to be misled or confused by the similarity of different marks." *Virgin Enters. Ltd.*, 335 F.3d at 151. Defendants argue that the target customer is highly discerning about food products such as rice. DE 24-5, ¶7. The product at issue here, however, is the retail grocery store business, not any individual food product. The average grocery shopper – even at a supermarket catering to uniquely Indian foods – is a casual consumer. Thus, the sophistication factor weighs in plaintiff's favor as well.

Upon evaluating all eight *Polaroid* factors, the Court finds that plaintiff has established a likelihood of success that Defendants' Marks are likely to cause consumers confusion as to the origin of the defendants' goods. As such, plaintiff has satisfied the requisite risk of irreparable harm needed for the issuance of a preliminary injunction. *Am. Cyanamid Co.*, 847 F.2d at 55; 15 U.S.C. § 1116(a).

    4.  *Public Interest and Balance of the Hardships*

Lastly, to grant injunctive relief the plaintiff must show that the public's interest weighs in favor of granting an injunction. "The Second Circuit has long held that there is a 'strong interest in preventing public confusion.'" *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 505 (S.D.N.Y. 2013) (citing *ProFitness Phys. Therapy Ctr. v. Pro–Fit Ortho. and Sports Phys. Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002)). Defendants do not contest that preventing trademark confusion serves the public interest. Rather, defendants merely argue the balance of the hardships do not tip in plaintiff's favor because the preliminary injunction would force defendants to pay for new signage and advertising. DE 24-4 at 11-12. Whereas the Court has already found a likelihood of success on the merits, it is unnecessary to weigh the balance of the hardships, which, in any event, would certainly tip in plaintiff's favor. Thus, the Court finds that the public interest weighs in favor of granting an injunction.

*Conclusion*

For the foregoing reasons, the Court concludes that plaintiff is entitled to a preliminary injunction enjoining defendants from using the Marks, any similar marks likely to cause confusion, or any other marks bearing the word "maharaja" because plaintiff has established by a likelihood of success: (1) irreparable harm absent injunctive relief; (2) a likelihood of success on the merits of the Lanham Act infringement claim, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public interest weighs in favor of granting an injunction.

Rule 65 "allows a preliminary injunction to become effective only upon the applicant's positing of an amount that the district court determines adequate." *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004). To comply with the preliminary injunction, defendants will be required to cease any and all use of any marks discussed herein and modify their advertising and business practices accordingly. Whereas the parties have not submitted any evidence regarding these costs or the profits generated at defendants' store, the Court finds that a $10,000 bond or escrow is sufficient to cover all potential costs and damages that defendants may incur if it is later found that they were wrongfully enjoined. *Cf. Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 251 (E.D.N.Y. 2009) (imposing a bond of $25,000 in a case

involving multiple restaurant locations in three cities in which defendant offered evidence regarding the costs of removing signage and promotional materials).

In accordance with the foregoing, IT IS HEREBY ORDERED that plaintiff's application for a preliminary injunction is GRANTED as follows:

1. During the pendency of this action, defendants, their agents, and all other persons in active concert or participation with them, and any corporation in which they have a controlling interest, are hereby enjoined from making use of the Marks, or any other mark or name likely to cause confusion with the Marks.  Defendants shall fully comply within ONE WEEK of this Order.

2. This preliminary injunction is subject to the filing by plaintiff of a bond or escrow in the amount of $10,000 for the benefit of defendants to cover any costs or damages incurred by the issuance of this preliminary injunction.  The bond or escrow shall be filed within 3 DAYS of this Order.  If there is not timely posting of the bond or escrow, defendants are permitted to return to this Court and make an application to vacate the preliminary injunction.

3. This injunction shall remain in effect until further order of this Court.

The parties are directed to file a joint status report with the Court as to the balance of the claims within 30 days of the date of this Order.

Dated:  Central Islip, New York
        August 2, 2022

                                                         /s/ Gary R. Brown_____
                                                        Gary R. Brown
                                                        United States District Judge